**LUCENTE, Plaintiff-Appellee, v. PHILIPEDES, Defendant-Appellant.**

Ohio Appeals, Seventh District, Mahoning County

No. 3067. Decided Nov. 13, 1945.

John Ruffalo, Youngstown, for plaintiff-appellee.

Manchester, Bennett, Powers & Ullman, Youngstown, for defendant-appellant.

### OPINION

By PHILLIPS, J.

Defendant Philipedes appeals on questions of law from a judgment of the court of common pleas entered upon a $10,-000.00 jury verdict for plaintiff returned in his action to recover damages for injuries to his left hand sustained on the

evening of February 5, 1943, when it came in contact with a permanently fixed and installed, open, unprotected and unguarded electric ventilating fan, while playing pool in the basement of a building owned by the Corinthian Realty Company, rented by defendant Philipedes on a month to month basis, and occupied by him as a pool and billiard parlor, which he operated at the time plaintiff was injured.

Plaintiff bases his right to recover in this action in substance upon the negligence of defendant Philipedes in installing, maintaining and permitting such fan to remain "wholly, open, unprotected and unguarded" when he knew or in the exercise of ordinary care ought to have known that such fan was unsafe and dangerous to persons rightfully upon such premises; in failing to cause any warning sign of sufficient size and legibility to be erected in the vicinity of such fan advising plaintiff and other persons of such "exposed, unguarded and dangerous fan"; and in failing to warn plaintiff in any manner "of the danger of coming in contact with said fan conditioned as herein set forth."

Plaintiff testified that on the evening in question he was playing pool on a table admittedly owned by defendant Philipedes situated about four to six feet from that fan, which was permanently built in the southerly wall of such basement near the easterly side thereof; that he did not notice the fan, didn't recall ever seeing it, and made no inspection to ascertain the existence of any changes around and about the place; that he backed away to enable another player to shoot pool and in so doing "bumped up against" a bench which was placed against the wall and lost his balance; that in order to steady himself he raised his hand which came in contact with the fan described inflicting injuries thereto; that his entire hand became infected; that part of his hand and his index finger above the knuckle were amputated; that the middle finger of his left hand was stiff, crooked and all the ligaments thereof were cut; that the thumb was mutilated, lacerated and otherwise injured; that the work in which he was engaged required the use of both hands; that has no grip with the left hand, and is unable to lift many things; that in holding anything requiring pressure he is limited to the use of two fingers on that hand; that during cold weather his thumb "it gets numb"; that the circulation of his left hand is impaired, and it is necessary to rub it to start circulation; that in the wintertime it gets very cold, and he is unable to keep it warm without gloves, and in the summertime during

change of weather it gets stiff; that the ligaments are "sort of shrinked up"; that he incurred medical expense in the amount of $125.00; that he was in the hospital two weeks where he incurred expenses amounting to $90.00; that during the nine weeks he was off work he suffered great pain and mental anguish, and presentlly suffers pain, humiliation, discomfort and inconvenience as the result of the condition of his hand, which condition is permanent; that he was thirty-three years of age and earning $60.00 to $65.00 per week.

Plaintiff's attending physician testified that when he first saw him in the emergency room in the hospital he "had quite a mangled hand"; that all "the soft tissues were hanging loose", and the "circulation was all disturbed and in fact the tissues had been black from lack of circulation"; that "due to the improper circulation and the disturbed nerve system in his hand, he will suffer through heat and cold"; that "some of the enervation has been disturbed in that"; that a part of the index finger had been cut off and "we had to take the whole thing off down to here"; that the middle finger was "torn off quite a bit", "that it is not worth much", "but we managed to put this back on there, sewed the tendons * * *"; that "it is quite stiff, he can bend it about fifty percent"; that "it is in his way and a handicap to have that finger on there"; that "it is stiff and had a rotation and shows some signs of atrophy", which he said is commonly known as shrinkage; that "shrinking and atrophy would further weaken his hand"; that "anyhow we patched the whole thing together and there is the remains of it"; that he "has a great interference" and "if he were to do certain kinds of work maybe the hand wouldn't be no (sic) good to him at all"; that "of course he has no normal grip and his grip has been definitely disturbed"; that "he is impaired, he has a definite disability there that handicaps him"; that with reference to further repair or improvement "what he has there is about all he will have. He may have some further atrophy of that finger and his thumb I think is not quite normal" that "all of those injuries are permanent."

Defendant's medical witness said:—

"The average person who closes the fingers down like that they touch the palm of their hand with the pad or end of the finger. He falls about an inch and a quarter short of that on a steady movement in closing the hand to grasp something."

"The grip, of course, is impaired because of his injuries and with grips smaller than an inch and a quarter in diameter the ability to grasp without the index finger is materially lessened, and if it is lessened about an inch I doubt whether he could grasp it at all."

"The tissues have shrunken somewhat."

"Well, a finger that can't be flexed far enough to get the end of the finger out of the road is constantly being bumped and you are not used to that finger sticking out and unconsciously at the moment you don't realize it is, even though it was bumped many times before it gets in the road and is constantly being injured. But if it flexes to the point the tip of the finger is protected that doesn't happen."

"Yes he has got an injured hand, all right."

When called by plaintiff for cross-examination defendant Philipedes testified that the ceiling of the basement was about six feet six inches and the fan about five feet eight inches from the floor, and testified upon direct examination in his own case that on the day of the trial he had checked such measurements and that the ceiling was seven feet eight inches and the fan was five feet ten inches from the floor. Subsequently upon cross-examination in his own case he testified in response to the question "is the fan there in the same condition it was before, as it was at the time of the accident?" that "it is the same way, there is a guard now."

The testimony of two deaf mutes was substantially the same, namely "that plaintiff didn't look what he was doing and put his hand in the fan" instead of in poolball rack situated beside the fan where he "intended" to put a pool ball, "he missed it but he intended to put it in the rack."

At the conclusion of plaintiff's testimony plaintiff dismissed his action as to all defendants except defendants Philipedes and Corinthian Realty Company. Thereupon the trial judge sustained the motion of the Corinthian Realty Company for a directed verdict. Subsequently the trial judge sustained plaintiff's motion to reopen his case, vacated his former order sustaining the motion of the Corinthian Realty Company for a directed verdict and allowed evidence to be introduced as to the control of the premises and with respect to the Corinthian Realty Company. After the introduction of such evidence the trial judge again sustained the motion of defendant Corinthian Realty Company for a directed verdict in its favor.

In his assignments of error defendant contends that the trial court erred to his prejudice in admitting incompetent and prejudicial testimony relating to repairs made after the accident; in allowing plaintiff to reopen his case and offer testimony as to repairs made after the accident, which "was incompetent and highly prejudicial to the rights of defendant-appellant"; in refusing to direct a verdict in favor of defendant Philipedes at the close of all the evidence; in his general charge to the jury; in not sustaining his motions for judgment in his favor notwithstanding the verdict of the jury against him and for a new trial; and claims that the verdict of the jury was rendered under the influence of passion and prejudice and is against the manifest weight of the evidence.

As stated defendant changed his testimony with reference to the height of the basement and the distance of the fan from the floor. Plaintiff does not complain about that but contends, and it is believed rightly so, that "in view of the new measurements which he testified" he made "on the same day" he testified and which differed from those originally made that the question "Is the fan there in the same condition it was before, as it was at the time of the accident?" was properly propounded on cross-examination in which counsel for plaintiff under the conditions presented in this case had considerable latitude in testing defendant's credibility and the accurracy of his measurements.

The answer to that question heretofore stated herein "it is in the same way, there is a guard on it now" was "voluntarily given." As "the trial judge observed" it was responsive to the question, and he ruled "there being no objection to the question the answer stays in." The trial judge did not err in denying the request of defendant's counsel to strike the answer from the record.

In accordance with the request of defendant's counsel made of the trial judge "to instruct the jury the fact that there is now a guard or something over that fan has no bearing whatever on any negligence on the part of this defendant at the time of the accident", the trial judge said "that is right. That evidence is not in the case as bearing on the question of negligence. It is not admitted on that basis at all, so that you will disregard it as bearing on the issue of negligence of defendant." It is believed that defendant's rights were not prejudiced in this respect as urged.

Now counsel for defendant contends that "to make matters even worse" for him the trial judge permitted plaintiff to

reopen his case and introduce testimony by way of cross-examination of defendant Philipedes as to who had control of the basement; as to whether there was an agreement that Corinthian Realty Company should make any or all repairs;. that it had put a guard on that fan after plaintiff was injured, and for "the purpose of showing that Corinthian Realty Company should not be dismissed as a defendant."

There are respectable authorities which hold that the testimony introduced "was competent only to show that it (the fan) was not so guarded at the time of the accident".

In view of the fact that the trial judge redirected a verdict in favor of the Corinthian Realty Company at the close of such testimony and in accordance with the request of counsel for defendant Philipedes instructed the jury that the testimony he had permitted to be introduced "should not in any manner be considered by them in determining whether or not Nick Philipedes was negligent" it is believed that the trial judge did not commit prejudicial error in permitting plaintiff to reopen his case, as urged.

In this case the court permitted the testimony of which complaint is made to be introduced but did not allow the jury to consider it.

Upon the evidence introduced in this case, some of which has been quoted, the conclusion is reached that questions for the determination of the jury were presented. Accordingly this court can not say that the trial judge erred to plaintiff's prejudice in overruling defendant's motion to direct a verdict in his favor made at the close of plaintiff's case which defendant waived by introducing evidence in his own case, or in overruling defendant's motion to direct a verdict which was renewed upon conclusion of all the evidence.

In his general charge to the jury the trial judge said:—

"Now, to sum up the issues, if you find by the greater weight of the evidence that the defendant was negligent in any respect as charged in the petition, and that negligence directly and proximately caused injury to the plaintiff then your verdict is for the plaintiff against the defendant, providing you further find plaintiff to be free from any negligence directly contributing to bring about his own injuries. If, upon the other hand, you fail to find by the greater weight of the evidence that the defendant was negligent in any respect as charged, or if you find that the defendant was negligent in one or more of the respects as charged but you fail to find by the greater weight of the evidence that that negli-

gence directly and proximately caused plaintiff injuries, or if your finding should be that plaintiff himself was negligent directly contributing to bring about his own injuries then and in those events or any of them your verdict is for the defendant."

Defendant Philipedes contends:—

"That when the court said, 'If, upon the other hand, you fail to find by the greater weight of the evidence that the defendant was negligent in any respect as charged, or if you find that the defendant was negligent in one or more of the respects as charged but you fail to find by the greater weight of the evidence that that negligence directly and proximately caused plaintiff injuries,' the court was in substance saying to the jury that they should try to find the defendant negligent in one or more of the respects charged by plaintiff, and that they should try to find that such negligence was a proximate cause of plaintiff's injuries. Ordinarily, no one fails to do something unless he has tried to accomplish it."

This portion of the charge to the jury is not so construed, and considering the charge as a whole the conclusion is reached that the trial judge did not commit prejudicial error therein as charged by defendant Philipedes.

Even though excessiveness of the verdict was assigned as a ground of error defendant made no claim that the verdict was excessive, and stated in open court that he "did not want a remittitur." In the words of the court in the case of City of Toledo v Nitz, 3 C. C. (n.s.) 532, "the verdict may be larger than some other jury may have given, it may be larger than the court would have given, but the injuries which" plaintiff "sustained were of a very serious character, and they are permanent. There is no question we" will "not disturb the verdict upon the ground that the damages are excessive."

Considering the record with reference to the size of the verdict in its entirety this court cannot reach the conclusion that the sum awarded by the jury is so grossly out of proportion to the compensation to which the plaintiff is entitled as to shock us into the certainty that this verdict had its source in the passion and prejudice of the jury, as urged by defendant.

The record in this case has been read and the conclusion reached that the verdict of the jury and judgment of the trial court entered thereon are not against the manifest weight of the evidence, and that the trial judge did not err to the prejudice of defendant Philipedes in overruling his motions for judgment in his favor notwithstanding the verdict of the jury against him or for a new trial.

The judgment of the trial court is affirmed.

NICHOLS, P. J., & CARTER, J., concur in judgment.